UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

| | | |
|---|---|---|
| **CASE NO.:** | CV 13-06411 SJO (PJWx) | **DATE:** June 26, 2015 |
| **TITLE:** | Capital One, N.A., et al. v. Lawrence Saks, et al. | |

========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                                    Not Present
Courtroom Clerk                                     Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**        **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                         Not Present

========================================================================
**PROCEEDINGS (in chambers): FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is before the Court on Plaintiff and Counter-defendant Capital One, N.A. ("Capital One"); Plaintiff and Counter-defendant Pointe Benefit Consultants, LLC ("Pointe Benefit"); Defendant, Cross-claimant, and Counterclaimant Massachusetts Mutual ("Mass Mutual"); Defendant and Cross-defendant Lawrence Saks ("Lawrence Saks" or "Mr. Saks"); and Defendant and Cross-defendant Jeanne Saks' ("Mrs. Saks") Motions for Judgment pursuant to Federal Rule of Civil Procedure Rule 52. On October 31, 2014, the Court found the matter suitable for disposition without a hearing and vacated the date. When the Court vacated the hearing date, the Court assumed this interpleader action, seeking an order establishing which party should be awarded benefits under the BETA Welfare Benefit Plan and Trust (the "Plan"), could be decided on the Administrative Record pursuant to *Kearney v. Standard Insurance*, 175 F.3d 1084 (9th Cir. 1999). Thereafter the Court reconsidered and on June 3, 2015, the Court issued an order resetting the matter for hearing for June 9, 2015. (Scheduling Notice of Setting Status Conference, ECF No. 127.) On June 8, 2015, the Court issued a twenty page tentative order. At the hearing on June 9, 2015, the Court heard argument and entertained the Parties' comments and objections to the Court's tentative. (Minutes of Status Conference, ECF No. 128.) The Parties were also given the opportunity to offer additional evidence. (Tr. of Status Conference 29: 3-7, ECF No. 129.) Capital One and Pointe Benefit have submit on the tentative (*see* Tr. of Status Conference 31:24;34: 17-25.)

The issues addressed in this Final Order are: (1) whether the Plan is qualified under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.; (2) if the Plan is not ERISA qualified, whether the Court has jurisdiction to hear this case; (3) whether California law applies to resolve the dispute; (4) whether Defendant and Cross-defendant Lawrence Saks committed fraud when he claimed to be disabled in order to obtain the Waiver of Premium Benefit ("WOP Benefit") under Policy 11-564-044 (the disputed policy); (5) if he committed fraud to procure the waiver, to what extent does his fraud affect the value of the disputed policy; and (6) whether Plaintiffs are entitled to Judgment as to Mass Mutual's counterclaim.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 13-06411 SJO (PJWx)</u>           DATE:  <u>June 26, 2015</u>

These Findings of Fact and Conclusions of Law are rendered pursuant to Federal Rule of Civil Procedure 52(a).  If any finding should be a conclusion, it is so deemed.  If any conclusion should be a finding of fact, it is so deemed.

I.    FACTUAL AND PROCEDURAL BACKGROUND

The procedural history of this case, the marital dissolution proceedings of Mr. and Mrs. Saks, and other civil and criminal litigations involving Lawrence Saks is tortuous and torturous.[1]  Capital One was the Trustee of the Plan dated January 1, 2003. (Interpleader Compl. ("Compl.") ¶¶ 3-4, ECF No. 1.)  Pointe Benefit is the Recordkeeper of the Plan.[2]  (Compl. ¶ 5.)  Capital One holds title as Trustee to the disputed life insurance policy (the "Policy").[3]  (Compl. ¶ 14.)  Plaintiffs allege that the Plan was adopted to provide welfare benefits to employees of Madison Park Surgery and Laser Center ("Madison Park") and that the Plan is governed by ERISA, 29 U.S.C. section 1001, et seq. (Compl. ¶ 12.)  Pursuant to the terms of the Plan, Madison Park made contributions to the Plan that were used to purchase whole life insurance policies from Mass Mutual covering Lawrence Saks and Mrs. Saks.  (Compl. ¶ 13.)  The policies were issued to Capital One in its capacity as Trustee and the Plan was named as the beneficiary of the policies.  (Compl. ¶ 14.)  The Trustee is the owner of the Plan assets including the Policy.  (Compl. ¶ 17.)

According to Pointe Benefit, Lawrence Saks is the only remaining participant in the Plan.  (Compl. ¶ 38.)  Pointe Benefit determined that if the Plan was terminated, all Plan assets, including

---

[1]  Lawrence Saks was a board certified plastic surgeon.  His license was revoked effective December 22, 2008.

[2]  Pointe Benefit is now both the Trustee and Recordkeeper of the Plan.  (*See* Plan § 7.07(a); Jeanne's Supplemental Evidence in Supp. of Mot., Decl. of Bruce A. Moss ("Moss Decl.") ¶ 3, Ex. W (Tab 18) February 29, 2012 Termination Letter ("Termination Letter"), ECF No. 74-5.)  For the purposes of this analysis, and because this distinction is immaterial, the Court treats Plaintiffs' roles interchangeably.

[3]  More information regarding the disputed insurance policy is found in the Saks' Marriage Settlement Agreement ("MSA").  Exhibit J of the MSA, titled "Life Insurance," references several insurance policies including the disputed Policy No. 11-564-044.  (*See* MSA 18:7-28 & Ex. J.; RJN, Tab 12 ("Aug. 26, 2010 Dep. of Lawrence") 83:7-84:7, ECF No. 53-4.)  The policy was issued by Mass Mutual.  (MSA, Ex. J.; Compl. ¶¶ 47-50.)   When the MSA was executed, the disputed policy insured the life of Lawrence Saks, had a current cash value of $1,121,515.59, a death benefit of $4,000,000, and Jeanne Saks was the named beneficiary.  (MSA, Ex. J.)  This policy is the only policy whose value is in dispute.  (*See* Declaration of Gayle Pedrotty in Support of Mass Mutual's Opening Trial Brief ("Pedrotty Decl."), Ex. 1.)

policies, should be distributed to Lawrence Saks.[4]  (Compl. ¶ 38; *see also* Plan § 5.02(b) (providing Plaintiffs such authority).)

Lawrence Saks and Mrs. Saks were married in 1981 (*see* Jeanne Saks' Request for Judicial Notice in Supp. of Mot. for Summ. J., Tab 8 ("Marriage Settlement Agreement" or "MSA"), Ex. J, ECF No. 53-4 at 1: 1), but due to "irreconcilable differences," the parties separated February 3, 2004. (MSA 1: 3.)  Upon divorce, Mr. and Mrs. Saks entered into the MSA, which was incorporated into the judgment of the Superior Court of California, County of Los Angeles ("Superior Court") on November 4, 2004.  (*See generally* MSA.)  When Capital One sought to terminate assets under Section 6.03 of the Plan, Plaintiffs noted the complication posed by Mrs. Saks' claim to Lawrence Saks' interest in the policies pursuant to the MSA.  (Compl. ¶ 39-42.)

To resolve conflicting claims, on August 30, 2013, Plaintiffs filed this interpleader action seeking an order establishing entitlement to Plan policies, adjudicating the value of Policy No. 11-564-044, determining whether Mrs. Saks is entitled to Plan assets (including the policies) pursuant to the MSA, and how distribution pursuant to her claim comports with the provisions of ERISA.[5]  (Compl. ¶ 40-42, 46-50 & Prayer for Relief.)

On October 31, 2013, Mass Mutual answered and filed a counterclaim against Capital One ("Counterclaim"). (*See generally* Mass Mutual's Counterclaim, ECF No. 23.)  In its Counterclaim, Mass Mutual sought a declaration of rights under the Policy No. 11-564-044 including a declaration that Lawrence Saks was not entitled to a wavier of premiums under the terms of this Policy.  (*See generally* Mass Mutual's Prayer for Relief, ECF No. 23.) Specifically, Mass Mutual sought the following:

(1)  For an Order setting forth the parties' respective rights and duties under Policy No. 11-564-044;
(2)  For an Order declaring that [Lawrence] was not entitled to a waiver of premiums under the terms and conditions of Policy No. 11-564-044;
(3)  For an Order that Mass Mutual recover its costs and attorneys' fees; and

---

[4]  The Plan may be terminated via provisions set forth under Plan Sections 6.03 or 7.07.

[5]  Plaintiffs' action was brought to enforce ERISA and the terms of the Plan under 29 U.S.C. section 1132(a)(3)(B)(ii).  Section 1132 provides: "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary . . . to obtain other appropriate equitable relief . . . to enforce . . . the terms of the plan." Plaintiffs are the fiduciaries, as defined by 29 U.S.C. § 1002(21)(A), bringing forth the civil action seeking equitable relief. (Compl. ¶ 4-5 & Prayer for Relief; Plan §§ 1.27, 1.35.) Under 28 U.S.C. § 1002(1), the Plan is purportedly qualified as an "Employee Welfare Benefit Plan" because the Plan provides, through the purchase of insurance, benefits in the event of death to participants or beneficiaries.  (Compl. ¶ 3; *see generally* Plan.)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** CV 13-06411 SJO (PJWx)        **DATE:** June 26, 2015

    (4)      For such further relief as the Court may deem just and equitable.

(Mass Mutual's Counterclaim and Prayer for Relief, ECF No. 23.) Mass Mutual's counterclaim did not allege that Capital One engaged in any wrongful act. (Counterclaim ¶ 6.)

Mass Mutual also filed crossclaims against Mr. and Mrs. Saks. (Mass Mutual's Crossclaim Against Lawrence Saks and Jeanne Saks, ECF No. 24.) Mass Mutual asserted three claims for relief: (1) Misrepresentation (against Lawrence Saks) (Cross-compl. ¶¶ 22-34); (2) Unjust Enrichment (against Lawrence Saks) (Cross-compl. ¶¶ 35-37); and (3) Declaratory Relief (against Lawrence Saks and Jeanne Saks). (Cross-compl. ¶¶ 38-42.)

At the center of Mass Mutual's counter and crossclaims is the contention that Lawrence Saks was not entitled to the WOP Benefit[6] on the disputed policy because he falsely claimed that he was disabled and not working as a board certified plastic surgeon when he was in fact performing surgeries. (Cross-compl. ¶¶ 17-19, 23-24, 36-37, 40.)

The Court finds the following Facts and Conclusions of Law to be supported by the evidence and the administrative record.[7]

On December 17, 1998, Mass Mutual issued the Policy No. 11-564-044 to Capital One, insuring the life of Lawrence Saks. (AR 01-000001-036.) The policy's face value is $4,000,000, with an annual premium of $201,530, to be paid in ten (10) equal installments in ten (10) consecutive years. (AR 01-000001-3.) At the time of issuance, the owner and beneficiary of the policy was the Trustee of the Plan. (AR-000004.)

The policy includes a Waiver of Premium Rider ("WOP Rider"). (AR 01-000023-26.) The WOP Rider provides that "premiums will be waived if the Insured becomes totally disabled." (AR 01-000023.) The WOP Rider provides that "Total Disability" is an incapacity of the Insured that:

     (1) is caused by sickness or injury; and

---

[6] The Waiver of Premium benefit provides that premiums on the policy will be waived if the Insured becomes totally disabled. Premiums covered are: (1) any premium that becomes due after the insured has been totally disabled for six months; (2) any premium that was due during the first six months of total disability; and (3) any premium (except the first one) that was due during the 31-day period before total disability began. (AR 01-000023.)

[7] "AR" refers to the Administrative Record, attached to the Pedrotty Declaration except for Exhibit 49, which is attached to the Request for Judicial Notice. (Request for Judicial Notice in Support of Judgement, ECF Nos. 102-1, 102-2, 102-3.) The first two numbers after "AR" refer to the Exhibit number, and the pages of the exhibit follow.

(2) begins while the WOP Rider and the Disputed Policy are in full force; and

(3) for the first 24 months of any period of total disability, prevents the Insured from performing substantially all the duties of the Insured's occupation; and

(4) after total disability has continued for 24 months, prevents the Insured from engaging in any occupation the Insured is qualified to perform.  For the first 24 months of any period of total disability, the Insured's occupation is the Insured's usual work, employment, business, or profession at the time total disability began.

After total disability has continued for 24 months, any occupation the insured is qualified to perform means any work, employment, business or profession that the insured is reasonably qualified to do based on education, training, or experience.  Until the insured reaches an age at which formal education may be legally ended, occupation means attendance at school.  (AR 01-000023-24.)

Before a premium waiver is allowed, proof of total disability is required.  (AR 01-000024.)  The insured must provide satisfactory written proof that: (1) the insured is totally disabled; (2) total disability began while the rider and the policy were in full force; (3) total disability began before the policy anniversary date nearest the insured's 65th birthday; and (4) total disability has continued for six months.  (AR 01-000024.)  The WOP Rider also requires "proof of continued disability." (AR 01-000025.)  During the first two years after proof of claim is received, the Insurer may require satisfactory proof of continued disability at reasonable intervals. (AR 01-000025.)  The WOP Rider states that the waiver benefit will end when any of the following occurs: (1) the insured is no longer totally disabled; (2) satisfactory proof of continued total disability is not given to us as required; (3) or the insured refuses or fails to have a required examination.  (AR 01-000025.)

On April 15, 2003, Lawrence Saks submitted a claim to Mass Mutual under the Policy's WOP Rider, claiming he was totally disabled from his occupation as a plastic surgeon and had been totally disabled since April 15, 2003.  (AR 02-000464-69.)   Mr. Saks stated that he could not perform "any activity that require[d] movement of [his] head for 15 minutes."  (AR 02-000464.)  Upon receiving Mr. Saks' claim that he was totally disabled, Mass Mutual began to waive premiums as of October 15, 2003.[8]  (AR 02-000444.)  Mass Mutual alleges that, throughout the claim period, Mr. Saks repeatedly and falsely claimed that he was not working at all as a plastic surgeon when in truth and in fact he was.  On an October 2003 claim form, in response to the question, "Have you performed any work since commencement of disability?" Mr. Saks checked the box labeled "No."  (AR 02-000464-65.)  In a 2005 interview with a claims adjuster, Mr. Saks reported he was not performing surgeries, and that he was only performing administrative duties for 15 hours per week.  (AR 02-000048-0052.)

---

[8] The Trustee paid five annual premiums each in the sum of $201,530 prior to October 2003 when Saks submitted a claim under the WOP Rider.  (AR 02-000112.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  CV 13-06411 SJO (PJWx)     DATE:  June 26, 2015

To verify Mr. Saks' eligibility for the WOP Benefit, Mass Mutual requested Current Procedural Terminology ("CPT") codes from him in order to create a reference for his pre- and post-claim duties.[9] (AR 02-000246.)  After Mr. Saks failed to provide the CPT Codes, in December 2006, Mass Mutual assigned an investigator to determine the duties Mr. Saks was performing at his practice, how many hours he was working, gather CPT code data, check the status of Mr. Saks' medical license, and determine whether any lawsuits were pending against him.  (AR 02-000282-84.)

Mass Mutual's investigation revealed bombshell information including: (1) June 2001 Medical Board charges against Lawrence Saks alleging the filing of false insurance claims, preparation of false statements, alteration of and failure to maintain appropriate records, instances of repeated negligence; (2) the suspension of Mr. Saks' medical license from September 27, 2003 through January 24, 2004, and his placement on probation for seven years;[10] (3) civil lawsuits filed against Mr. Saks including an allegedly botched surgery resulting in a patient's death during liposuction; and (4) evidence that Mr. Saks was working four days a week as of January 11, 2007; and (5) that Dr. Brian Evans, another plastic surgeon, was no longer working with Mr. Saks.  (AR 02-000257-67.)

In written correspondence dated February 6, 2007 and February 20, 2007, Mass Mutual again demanded CPT codes covering the period from 2002 through February 2007.  (AR 02-000244; AR 02-000252.)  On February 21, 2007, Mr. Saks called Mass Mutual claiming that he did not have CPT codes.  (AR 02-000243.)  Unable to obtain any information and now highly suspicious that Mr. Saks had submitted a fraudulent claim, in March and April 2007, Mass Mutual commenced *sub rosa* surveillance to determine if foul play was at hand.  (AR 02-000151-74; AR 02-000132-43.)  On March 29, 2007, Mr. Saks' receptionist told an investigator that Mr. Saks would be performing surgery the next day until noon, and that he would then be seeing patients until 5:00.  (AR 02-000153.)  Surveillance on Friday, March 30, 2007, established that Mr. Saks arrived at his office prior to 6:40am and stayed until 6:02pm.  (AR 02-000157-58.)  On April 2, 2007, Mr. Saks' vehicle was observed outside his office around 10:30am, and he was observed leaving the office at 7:08pm.  (AR 02-000160-61.)  Surveillance between April 16 and 20, 2007 showed a similar pattern of him at his office all day, then going to the gym.  (AR 02-000133-43.)  In response to a letter of inquiry from Mass Mutual dated May 16, 2007, Mr. Saks indicated that his time in the office was spent doing "desk-type work" and that he was not

---

[9] CPT codes are a set of codes used in billing that describe medical and surgical services that doctors performed.  Lawrence Saks' center used CPT codes when billing insurance companies.  (AR 02-001064.)

[10] The investigation also revealed that Lawrence Saks' privileges to admit patients at Bay Harbor Hospital and Little Company of Mary Hospital were revoked effective November 21, 1996 and February 28, 2002, respectively.  (AR 02-000260.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 13-06411 SJO (PJWx)</u>     DATE: <u>June 26, 2015</u>

performing surgeries. (AR 02-000127.)

During the time Mr. Saks claimed to be totally disabled and receiving the WOP Benefit, unbeknownst to Mass Mutual he sued Fireman's Fund for insurance benefits in connection with an alleged burglary of his medical office. In that lawsuit, he represented under penalty of perjury, that he suffered approximately 150 hours in time lost from his medical practice and that he normally averages $3,000-$4000 per hour while in surgery. (AR 02-000923-25; AR 02-000933.) Mr. Saks' statement in the Fireman's Fund lawsuit directly contradicted his claim of disability made to Mass Mutual.

In a letter dated June 16, 2007, Mass Mutual notified Mr. Saks that his claim was denied because the information Mass Mutual had gathered established that he was not totally disabled at any time from April 16, 2003 forward. (AR 02-000120-21.) Mass Mutual advised Mr. Saks that premiums waived from December 17, 2003 through December 17, 2006 in the amount of $201,530 per year were to be repaid and demanded immediate payment in the sum of $806,120.[11] (AR 02-000120-0121.)

The plot thickened in June 2008. A federal grand jury indicted Mr. Saks for health care fraud, mail fraud, false statements relating to health care matters, aggravated identity theft, and other crimes. (*See* Mass Mutual's Req. for Judicial Notice in Supp. of Mot. for J. ("Mass Mutual's RJN"), Ex. A., First Superseding Indictment ("FSI").) Counts one through six, violations of 18 U.S.C. section 1343 ("wire fraud"), were based on Mr. Saks' fraudulent written and oral claims to disability and life insurance companies, including Mass Mutual. (FSI ¶¶ 3-6.) The Mass Mutual policy contained in the FSI is the same policy in dispute here. (FSI ¶ 2(f).) Counts seven through ten alleging, violations of 18 U.S.C. section 1341 ("mail fraud"), were based on the same policies and scheme to defraud as counts one through six. (FSI ¶¶ 8-9.) In January 2010, after a 10-day jury trial, Mr. Saks was convicted of four counts of health care fraud, five counts of mail fraud, four counts of making false statements relating to health care matters, and three counts of aggravated identity theft. (*See* Mass Mutual's RJN, Ex. F, Judgment and Commitment Order.) One count of mail fraud, count seven, was based on Mr. Saks' statement to Mass Mutual on his October 2003 disability claim form. (FSI ¶ 9.) In February 2010, in a concurrent criminal proceeding Mr. Saks pled guilty to counts one through eight in an information each of which charged a violation of 26 U.S.C. section 7206(1) ("Tax Fraud"). (*See* Mass Mutual's RJN, Ex. E ("Plea Agreement"), ECF No. 102-1.) In the factual basis to support his plea, Lawrence Saks admitted under oath, the following:

> Prior to September 2003, defendant had disability insurance policies with . . .

---

[11] At the June 9 hearing Counsel for Mass Mutual advised the Court that the current amount due for unpaid premiums on the Policy is $1,007,650 not including prejudgement interest or other adjustments not disputed by the other parties. (*See* Tr.of Status Conference 13: 9.)

> **Massachusetts Mutual Insurance Company ("Mass Mutual")**. These policies in summary provided that defendant would receive benefits if he became unable due to injury or sickness to engage in his occupation as a plastic surgeon. From September 2003 through May 2007, **defendant made false statements to**, and concealed facts from, his insurers, intending the false statements and concealments to increase defendant's chances of receiving insurance benefits. **Defendant's false statements included statements, both orally and in writing, that defendant was performing no work as a plastic surgeon during his claimed disability period. In fact, defendant actually was performing plastic surgery work during this period.** Defendant's false statements also included his intentionally and significantly understating to the insurers his true income during his claimed disability period. Defendant's concealments included his keeping from the insurers the fact that defendant had a computer database that contained information regarding defendant's patient treatments and billings during his claimed disability period. Defendant was aware at the time that his insurers wanted true and accurate income and patient treatment and billing information.

(Plea Agreement, Attachment A ¶ E, ECF No. 102-1) (emphasis added).

### A. <u>Jeanne Saks' Motion for Summary Judgment</u>

On February 21, 2014, Mrs. Saks moved for summary judgment on the issue of her right to obtain title to and possession of Plan policies pursuant to the MSA. (Jeanne Saks Mot. for Summ. J. or Partial Summ. J. ("MSJ"), ECF No. 53.) Lawrence Saks and Pointe Benefit opposed the MSJ. Lawrence Saks argued that the Plan was ERISA qualified and could not be terminated. Unsurprisingly, Mr. Saks disavowed promises he made in the MSA. He claimed that Mrs. Saks was never a beneficiary under the polices and any transfer of interests pursuant to the MSA was ineffective. (*See generally* Lawrence Saks' Opp'n to [MSJ], ECF No. 65.) Pointe Benefit opposed the MSJ disputing Mrs. Saks' claims that she was the owner of the policies, (Pointe Benefit's Opp'n to [MSJ], ECF No. 62), and her claim that the Plan was not ERISA qualified. (Statement of Genuine Issues of Material Fact, ECF No. 63 at 10.) Plaintiff Capital One also filed a reply to the MSJ disputing Mrs. Saks' claim that the Plan was not ERISA qualified.

> "Capital One does not oppose the relief sought in [Mrs. Saks'] motion for summary judgment. That Capital One does not oppose the relief sought in [Mrs. Saks'] motion should not, however, be construed as Capital One's agreement with any of the substantive arguments, factual statements, or legal conclusions set forth in the motion, including but not limited to [Mrs. Saks'] factual and legal contentions regarding the requirements and application of ERISA."

(Capital One's Response to [MSJ], ECF No. 64.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 13-06411 SJO (PJWx)</u>      DATE: <u>June 26, 2015</u>

In her MSJ, only Mrs. Saks claimed the Plan was not ERISA qualified. Mrs. Saks argued that her right to the policies pursuant to the MSA was valid under ERISA. Alternatively, if ERISA proscribed such transfer, she claimed the Plan was not ERISA qualified.[12]

On August 6, 2014, the Court granted in part Defendant Mrs. Saks' Motion for Summary Judgment ("MSJ Order"). The Court concluded that Mrs. Saks was the proper recipient of Plan assets and that upon distribution, Plaintiffs were to directly disburse the assets to her. (*See generally* MSJ Order, ECF No. 94.) The Parties' dispute over the value of the policy at issue here, as it related to the allegations of Lawrence Saks' fraud in Mass Mutual's Counter-complaint and Cross-complaints, was not addressed because the issues were not presented to the Court. Nor did the Court directly rule on whether or not the Plan was ERISA qualified. Such a finding was not required to resolve the issue raised in Mrs. Saks' MSJ.

Because the Court accepted Plaintiffs, Mass Mutual, and Mr. Saks' claim that ERISA governed the proceeding, the Court vacated the trial date and set a briefing schedule. (Order Granting Mot. to Continue Pretrial Conference and Trial, ECF No. 97.) The parties were to file a joint statement by August 28, 2014 identifying the Administrative Record if any and if an Administrative Record existed, a copy of such Record was to be lodged with the Court by September 22, 2014; Opening Trial Briefs were due by September 30, 2014; Responding Trial Briefs were due by October 21, 2014. A bench trial was set for November 4, 2014.

On August 28, 2014, the parties filed a joint statement identifying the Administrative Record, (Joint Statement Identifying Administrative Record, ECF No. 98) and Trial Briefs. (ECF Nos. 101, 102, 105, 106, 110, 111, 112). On October 31, 2014, the Court concluded that the matter was suitable for disposition without an evidentiary hearing or oral argument and vacated the trial. (Minute Order Vacating Bench Trial, ECF No. 123.) Following the Court's Order, Mass Mutual objected to several pleadings filed by Mrs. Saks: (1) Proposed Findings of Fact and Conclusions of Law (ECF Nos. 116, 116-1); (2) Trial Exhibits (ECF Nos. 118, 118-1); (3) Amended Exhibit List (ECF Nos. 119, 119-1); and (4) the opinion of *McVey v. McVey*, 26 F.Supp.3d 980 (C.D. Cal. June 16, 2014). (Objections, ECF Nos. 122, 124, 125, 126.)

In Jeanne Saks' Rule 52 submissions, the threshold issue raised is whether the Plan is qualified under ERISA. She claims the Plan is not an ERISA Plan because she and Lawrence Saks were the sole owners and only employee participants of Madison Park, and ERISA provides that "an individual and his or her spouse shall not be deemed to be employees with respect to a ...

---

[12] Plaintiffs brought their Interpleader Complaint pursuant to ERISA. (Compl. ¶ 9.) In its Answer, Mass Mutual admitted that "Plaintiffs have brought this action pursuant to ERISA § 502(a)(3)(B)(ii) (29 U.S.C. § 1132(a)(3)(B)(ii)). (Mass Mutual's Answer ¶ 9, ECF No. 21.) In his Answer to the Interpleader Compl., Lawrence Saks admitted the Plan was an "employee Welfare benefit plan" defined by section 3(1) of ERISA. (Lawrence Saks' Answer to Interpleader Compl. ¶¶ 3, 9; ECF No. 15.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 13-06411 SJO (PJWx)</u>     DATE: <u>June 26, 2015</u>

business ... which is wholly owned by the individual and his or her spouse." 29 C.F.R. § 2510.3(c)(1). Mrs. Saks argues that because Madison Park (the sponsoring employer of the Plan) employed only her and Mr. Saks, the Plan fails to meet the requirements of C.F.R. section 2510.3. Mrs. Saks contends that since the Plan is not ERISA qualified, California law governs the rights of the parties regarding Mass Mutual's crossclaim and the value of the disputed insurance policy.

The Court addresses in turn the issues previously identified and implicated in the parties' Motions for Judgment.

II.     <u>DISCUSSION</u>

   A.   <u>Legal Standard for Qualified ERISA Plan</u>

"The existence of an ERISA plan is a question of fact, to be answered in light of all the surrounding circumstances from the point of view of a reasonable person." *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1120 (9th Cir.1998) (quoting *Credit Managers Ass'n v. Kennesaw Life & Acc., Ins. Co.* 809 F.2d 617, 625 (9th Cir.1987)). The burden of establishing the existence of such a plan falls on the asserting party. *Zavora*, 145 F.3d at 1120 n.2. In order to qualify as a plan under ERISA, the plan must be (1) a plan, fund or program, (2) established or maintained, (3) by an employer or employee organization, (4) for the purpose of providing benefits (5) to participants or their beneficiaries. 29 U.S.C. § 1002(1); *Patelco Credit Union v. Sahni*, 262 F.3d 897, 907 (9th Cir.2001).

ERISA defines a "participant" as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7). "The term 'employee' means any individual employed by an employer." 29 U.S.C. § 1002(6). In order to clarify these definitions, the Secretary of Labor has promulgated the following regulation:

(c)     Employees. For purposes of this section:

   (1)   An individual and his or her spouse shall not be deemed to be employees with respect to trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his or her spouse, and
   (2)   A partner in a partnership and his or her spouse shall not be deemed to be employees with respect to the partnership.

29 C.F.R § 2510.3(c)(1)-(2).

The Supreme Court has adopted a common-law test for determining who qualifies as an "employee" under ERISA. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24,(1992).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** CV 13-06411 SJO (PJWx)   **DATE:** June 26, 2015

In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. *Id.* (citation omitted).

    B.    <u>Analysis</u>

Plaintiffs and Mass Mutual contend that the Plan is covered by ERISA because "[u]nder the Plan's adoption agreement, any full time employee who had one year of service and who was at least 21 years old was eligible to participate in the Plan." (AR 49-000111-12.) Mass Mutual claims that persons other than Mr. and Mrs. Saks, including nurses, medical assistants, and doctors were employed by Madison Park and participants in the Plan.

Mrs. Saks counters that the Plan is not ERISA qualified because, "the sponsoring employer, Madison Park, was at all times, wholly owned by [Lawrence Saks] and [Mrs. Saks] prior to the execution of the MSA in September 2004 when this company was awarded to [Lawrence Saks]." (AR 49-000110-16; 49-000118-24; 49-000116-32.) Moreover, Mrs. Saks contends that Madison Park never employed anyone other than herself and Mr. Saks. Accordingly, there were no other plan participants.

No party has made a convincing showing as to the connection between Madison Park and the plan participants. The evidence provided by Mass Mutual reflects that the Plan was purchased to provide welfare benefits to Mr. and Mrs. Saks only. Each iteration of the Plan Document indicates that Mr. and Mrs. Saks were the only participants in the Plan. (AR 49-000115; AR 49-000123; AR 49-000131-32.) Under the "Eligibility" section, the Plan Document indicates that any full-time employee with one year of service who is over 21 years of age is eligible. It specifically states "[p]ersons treated as independent Contractors [sic] by employer whether or not classified as employees by IRS are not eligible." Additionally, "[p]art time temporary employees are not eligible." (AR 49-000119-120.)

Mass Mutual directs the Court to the testimony of Gina Corcoran offered during the trial of *National Life Ins., Co., et al. v. Saks*, 2:07-CV-03061-GW-SS.[13] (*See* Request For Judicial Notice filed by

---

[13] In 2007, National Life Insurance and Provident Life and Accident Insurance brought an action against Lawrence Saks for restitution of benefits paid to him under two disability

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Priority | ____ |
|---|---|
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

CASE NO.: **CV 13-06411 SJO (PJWx)**   DATE: **June 26, 2015**

[Lawrence Saks] ("National Life Trial Transcript")[14] ECF No. 107.) In her testimony, Ms. Corcoran states that she began working for Lawrence Saks in 1998 and was employed by him for approximately ten (10) years. (AR 04-000408.) Her testimony suggests that other persons, besides Mr. and Mrs. Saks, were working for Madison Park. However, it does not establish that these persons were Plan participants or eligible to participate. For example, it appears that she meets the age and full-time work requirements to participate in the Plan. (AR 04-000408.) However, Ms. Cocoran's testimony is silent as to the identity of her employer. Although she states that she was hired by Lawrence Saks after she was a patient of his, (AR 04-000408), she does not identify with requisite specificity who her employer was. While it is possible that Ms. Corcoran and the persons mentioned in her testimony were employed by Madison Park and eligible plan participants her testimony is at best unclear. Mrs. Saks asserts that Corcoran's statement that she worked for Lawrence Saks does not establish that she was employed by Madison Park as he owned two other medical businesses: (1) Lawrence Saks, MD, Inc., a medical corporation and (2) Lawrence Saks, MD dba Reconstructive Surgery Associates, a medical sole proprietorship. (*See* Declaration of Jeanne Saks in Response to Objections of Mass Mutual ¶ 4; *see also* MSA 7: 4,6.)

The burden to show that the Plan is ERISA qualified lies with Plaintiffs and Mass Mutual. The relationship between the other employees and Madison Park is not clear and the better evidence presented to the Court indicates that Mr. and Mrs. Saks were the sole owners of Madison Park and the only participants under the Plan. Accordingly, the Court concludes that Mass Mutual has not met its burden that the Plan is a qualified ERISA Plan.

  C. <u>Jurisdiction</u>

Despite, the failure to show that the Plan was ERISA qualified, this Court retains subject matter jurisdiction over the suit. *See* 26 F.Supp.3d at 995 ("the fact that the plan at issue is not ERISA qualifies [sic] means that plaintiff's claims fail on the merits, but does not deprive the court of subject matter jurisdiction"). Moreover, subject matter jurisdiction appears proper based on diversity jurisdiction pursuant to 28 U.S.C. section 1332(a). The original complaint was for interpleader relief, the parties are completely diverse.[15] The amount in controversy is well over

---

insurance policies and restitution of policy premiums that were waived based upon his alleged total disability. The case went to trial and a jury verdict awarded damages in favor of the plaintiffs in the amount of benefits paid and premiums waived.

[14] In Lawrence Saks' Request for Judicial Notice, the pages of the National Life Trial Transcript are numbered in a similar fashion to the Administrative Record where the first two numbers indicate the exhibit and the following numbers indicate the page.

[15] Capital One is a national banking association with its main office located in Virginia. (Cross-compl. ¶ 5.) Pointe Benefit's main office is located in Saint Clair Shores, Michigan. (Compl. ¶ 5.) Lawrence is a citizen and resident of California. (Cross-compl. ¶ 3.) Jeanne

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

| | |
|---|---|
| CASE NO.: CV 13-06411 SJO (PJWx) | DATE: June 26, 2015 |

$75,000. (*See generally* Compl.)

   D.   Applicable Law

Since Mass Mutual has not established that the Plan is ERISA qualified, California law governs Mass Mutual's counter and cross-claims and interpretation of the disputed policy. In its Cross-claim against Lawrence Saks, Mass Mutual alleged three causes of action: (1) misrepresentation, (2) unjust enrichment, and (3) declaratory relief. (*See generally* Cross-compl.) Mass Mutual asserts that Lawrence misrepresented himself in his application for the WOP Benefit and was unjustly enriched as a result of the waiver of premiums. (Cross-compl. ¶¶ 22-37.) The burden of proof is on the insurer to establish concealment or misrepresentation, which includes negating possible excuses or explanations offered by the insured for the misstatement or omissions in the insured's application. *Casey By and Through Casey v. Old Line Life Ins. Co. of America*, 996 F.Supp. 939, 944 (N.D. Cal. 1998) (citing *Thompson v. Occidental Life Ins. Co.*, 9 Cal.3d 904, 915 (1973).)

The elements of fraudulent misrepresentation are: (1) the defendant misrepresents material facts; (2) with knowledge of the falsity of the representations or the duty of disclosure; (3) with intent to defraud or induce reliance; (4) which induces justifiable reliance by the plaintiff; (5) to his or her detriment. *Hahn v. Mirda*, 147 Cal. App. 4th 740, 748 (2007).

Here, Mass Mutual has met its burden. Overwhelming evidence establishes that Lawrence Saks falsely represented to Mass Mutual that he was disabled and could not perform his regular duties as a plastic surgeon when in fact he could. On his October 18, 2003 waiver of premium claim form, in boxes "8A" and "9A", Mr. Saks stated that he "ceased work entirely" on April 15, 2003 and could not perform "any activity that requires movement of head for 15 minutes." (AR 02-000464.) On November 17, 2004, he checked "no" in response to a question on Mass Mutual's waiver of premium disability Progress Report asking whether he had "performed any work activity" since completing his last report. (AR 02-000105.) During an August 2005 interview with a Mass Mutual investigator, he reported that he went to his office daily for a few hours and on weekends, but he was not performing any operations, and only conducted limited administrative work. (AR 02-000048-50.) In a September 2005 interview, he confirmed that he did not perform any operations and engaged in only minor book work and minimal tasks. (AR 02-000051-52.) In June 2006, he reported to Mass Mutual that he had not "performed any work activity" since completing his last progress report in November 2004. (AR 02-000408.) In a July 31, 2006 letter to Mr. Saks, Mass Mutual asked him to confirm whether he still had his medical practice and, if so, to identify who was running it. (AR 02-000407.) Mass Mutual also asked whether Mr. Saks was still going into his office, how many hours per week he was spending there, and what job duties he was

---

is a citizen and resident of California. (Cross-compl. ¶ 7.) Mass Mutual is an insurance company existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located in Springfield, Massachusetts. (Cross-compl. ¶ 1.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** CV 13-06411 SJO (PJWx)     **DATE:** June 26, 2015

performing. (AR 02-000362.) Mass Mutual's claim examiner indicated that Mr. Saks stated in a phone interview that Dr. Brian Evans was running the practice and that Mr. Saks performed clerical duties 15 hours per week. (AR 02-000362.) Contrast these representations with: (1) Mr. Saks' statements made under oath that he lost 150 hours that he could have used to perform surgery from July 2003 to August 2004 in his litigation against the Fireman's Fund Insurance Company (AR 02-000933); (2) his conviction for making false statements to Mass Mutual regarding his disability status and ability to work; and (3) his admissions in the plea agreement that he made false statements to Mass Mutual regarding his ability to work as a plastic surgeon and concealed the fact that he had a computer database containing information regarding his patient treatments and billings during his claimed disability period. (*See* Plea Agreement, Attachment A.)

The record, combined with Mr. Saks' admissions in the Plea Agreement, establish beyond any doubt that: (1) Mr. Saks misrepresented material facts; (2) with knowledge of the falsity of the representations or the duty of disclosure; and (3) with intent to defraud or induce reliance on the part of Mass Mutual. The only remaining elements of misrepresentation are actual inducement or reliance and damages, both of which have been satisfied. Here, the record is clear. Mass Mutual in reliance on Mr. Saks' representations waived the premiums from October 15, 2003 until June 15, 2007. (AR 02-000120-0121.) The total amount of premiums due on the Policy is $1,007,650 and is not in dispute. (AR 02-000121.)

In his briefs, Counsel for Mr. Saks puts forward two arguments to rebut Mass Mutual's findings. First, Counsel asserts that Mr. Saks was "totally disabled" as that term is defined by California law, thus entitling him to benefits under the policy. Specifically, Counsel contends that Mr. Saks was not able to perform his occupation the normal and customary way with reasonable continuity due to a neck injury. Second, Counsel suggests that Mr. Saks did not fight the criminal conviction and guilty plea because he no longer had the resources to contest either and that his misstatements do not preclude the conclusion that he was disabled, as defined by law. Importantly, Mr. Saks did not offer a declaration to support these claims. Had he done so, it would call into question whether Mr. Saks lied when he stated under oath in his plea agreement and orally in open court the following:

> From September 2003 through May 2007, **defendant made false statements to, and concealed facts from, [Mass Mutual]**, intending the false statements and concealments to increase defendant's chances of receiving insurance benefits. **Defendant's false statements included** statements, both orally and in writing, **that defendant was performing no work as a plastic surgeon during his claimed disability period. In fact, defendant actually was performing plastic surgery work during this period.**

(Plea Agreement, Attachment A ¶ E.)

Mass Mutual also claims Lawrence Saks was unjustly enriched as a result of the waiver of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.:   CV 13-06411 SJO (PJWx)            DATE:   June 26, 2015

premiums. (Cross-compl. ¶¶ 35-37.) Under California law, the elements of unjust enrichment are: (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another. *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000). However, "[t]here is no cause of action in California for unjust enrichment." *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 794 (2003). Instead, "[u]njust enrichment is synonymous with the remedy of restitution." *Walker v. USAA Cas. Ins. Co.*, 474 F. Supp. 2d 1168, 1174 (E.D. Cal. 2007) (citing *Dinosaur Devl, Inc. v. White*, 216 Cal. App. 3d 1310, 1314-15 (1989).

At the hearing, Counsel for Mr. Saks withdrew the argument regarding Mr. Saks' lack of resources as a reason for entering into the plea agreement. (*See* Tr. of Status Conference 21: 12.) Also at the hearing, Counsel for Mr. Saks, on behalf of Mr. Saks, admitted he made material representations to Mass Mutual for the purpose of increasing his chances of receiving disability benefits. (*See* Tr. of Status Conference 18: 5-11.)

Accordingly, Mass Mutual is not entitled to judgment on its unjust enrichment claim.

> E.   Mass Mutual's Cross-claim Against Jeanne Saks

Mass Mutual seeks an order setting forth the parties' respective rights and duties under the Policy and an order declaring that Lawrence Saks was not entitled to a waiver of premiums under the terms and conditions of the Policy. (Cross-compl. ¶ 8.) As stated, this Court has found that Mrs. Saks is the proper recipient of Plan assets, which includes the policies. (*See generally* MSJ Order.) However, Mrs. Saks claims that Mass Mutual cannot adjust the value of the Policy in light of the fraud committed by Mr. Saks. Mrs. Saks advances three arguments in support of her claim: (1) the outstanding premiums are a debt incurred by and assigned to Lawrence Saks through the MSA for which Mrs. Saks cannot be held liable; (2) the Policy does not provide Mass Mutual with any contractual right to devalue Mrs. Saks' interest in the Policy and is specifically prohibited from reducing the value according to its terms; and (3) Mass Mutual's declaratory relief claim is time-barred by more than three years. The Court addresses each of these arguments in turn.

In support of her first argument, Mrs. Saks relies on California Family Code section 916(a)(2) which reads in part:

> "The separate property owned by a person at the time of the division and the property received by the person in the division is not liable for a debt incurred by the person's spouse before or during marriage, and the person is not personally liable for the debt, unless the debt was assigned for payment by the person in the division of the property."

Mrs. Saks contends that Mr. Saks did not assign any purported debt on the disputed policy to her through the MSA. She is correct in that the obligation to pay premiums was assigned to Mr. Saks. However, her contention that the MSA and Cal. Fam. Code section 916(a)(2) exempt her from the terms of the Policy or the Plan does not persuade. First, Mrs. Saks is conflating debt incurred with

Case 2:13-cv-06411-SJO-PJW Document 131 Filed 06/26/15 Page 16 of 20 Page ID #:4947

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.: CV 13-06411 SJO (PJWx)          DATE: June 26, 2015

property received. Second, even if the Court characterized Mass Mutual's attempt to reduce the value of the Policy as a lien, section 916(a)(2) is not an impenetrable shield for which property is absolutely protected after transfer through a dissolution agreement. Following the division of property, the community property awarded to one spouse is no longer liable for marital debts that are assigned to the other spouse, with the exception that the award of community property to one spouse that is previously subject to a valid lien remains liable for satisfaction of the lien. *In re Marriage of Turkanis and Price*, 213 Cal. App. 4th 332, 349 (2013).

At the June 9 hearing, Counsel for Mrs. Saks argued that, "there was no lien which existed against the asset at the time the [MSA] was signed in September 2004." (Tr. of Status Conference 23: 12-19.) In support, Counsel for Mrs. Saks directed the Court to *Litke O'Farrel, LLC v. Tipton*, 204 Cal. App. 4th 1178 (2012). In *Litke O'Farrel*, the trial court entered judgment for $523,979.28 in favor of Litke and against Mr. Tipton and others. *Id.* at 1181. To satisfy the judgment, Litke O'Farrel filed a motion to charge the interests of Mr. Tipton in certain partnerships and limited liability companies. *Id.* However, before the motion was actually served and filed, Mr. and Mrs. Tipton executed a marriage settlement agreement. The MSA divided the community property assets in question, confirming half to Mrs. Tipton and half to Mr. Tipton, while saddling Mr. Tipton with the sole responsibility for the judgment debt owed to Litke. *Id.* The Court of Appeal for the State of California found that because the marriage settlement agreement divided the community estate prior to Litke's motion to charge interests, the judgement against the husband could not be satisfied by resort to the wife's interest in those assets. *Id. at* 1184.

*Litke* differs from the facts in this case. Here, as soon as the Policy was executed by the Parties, there was an obligation to pay premiums. The obligation to pay existed before the execution of the MSA and continued after the interest was assigned to Mrs. Saks and the obligation to pay premiums was assigned to Mr. Saks. *Cf. In re Marriage of Turnkanis and Price* at 349. ("[T]he allocation of community real property to the nondebtor spouse in the property division does not affect the enforceability of any liens that previously attached to that real property, even if the underlying debt is assigned exclusively to the debtor spouse. [T]he nondebtor spouse may seek reimbursement against the debtor spouse to the extent the property is applied in satisfaction of the liens.") (citing *Lezine v. Security Pacific Financial*, 14 Cal.4th 56, 73-74 (1996)). Nor did the obligation to pay premiums arise when Mass Mutual demanded payment in 2007. (*See* Tr. of Status Conference 25: 22-25.) Again, the obligation to pay premiums arose as soon as the Trustee and Mass Mutual entered into an agreement.

Moreover, the cases cited by Mrs. Saks are inapposite as they concern property that was originally owned by the spouse or spouses. *See, e.g.*, *Gagan v. Gouyd*, 73 Cal. App. 4th 835, 838-39 (1999) (four parcels of real property and other personal property originally owned by spouses); *Mejia v. Reed*, 31 Cal. 4th 657, 666 (2003) (real property jointly held by spouses); *Litke O'Farrel, LLC v. Tipton*, 204 Cal. App. 4th 1178, 1180 (2012) (ownership interests in partnerships and limited liability companies); *In re Marriage Braendle*, 46 Cal. App. 4th 1037, 1039-40 (1996) (stock interest originally owned by husband). Here, the Policy is owned by the Trustee, not Mr. or Mrs. Saks. In the MSA, Mr. Saks could not assign more than what he actually had, which was a

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

**CASE NO.:** CV 13-06411 SJO (PJWx)        **DATE:** June 26, 2015

beneficial interest in the Policy subject to its terms and any other agreement. In turn, when the Trustee moved to terminate the Plan and distribute the assets to Mr. Saks, it could not assign more than it had, which was the value of the policy in light of Mr. Saks' fraud.

The MSA contains a general section describing the rights and responsibilities of Mr. and Mrs. Saks with respect to the policies under the section entitled "Life Insurance." (MSA 18:7.) This section obligates Lawrence Saks to "maintain without interruption all life insurance and retirement policies as set forth in Ex. [J] . . . and . . . pay all premiums as and when such premiums become due."[16] (MSA 18:8-10.) He agreed to "not pledge, hypothecate, borrow against, change, cancel or terminate any of the [policies]." (MSA 18:13-16.) He is required to "notify all applicable insurance companies, in writing, that as part of their contractual obligation they are required to notify [Jeanne] of any non-payment of premiums . . . ." (MSA 18:16-18.) If he fails to pay the required premiums to maintain the policies and if Mrs. Saks covers the payments, she is entitled to "recover all such sums actually paid by her from [Mr. Saks] or his estate, together with interest." (MSA 18:21-24.) If Mrs. Saks does "not receive the entire amount of death benefits pursuant to [the MSA] as set forth in Ex. [J], Jeanne shall be entitled to payment from [Mr. Saks'] estate of the full amount of all death benefits . . . ." (MSA 18:24-28.)

The MSA contemplates a situation where Mr. Saks fails to make premium payments on the policies and provides Mrs. Saks with the remedy of recovering costs from him or his estate. However, nowhere in the MSA is there language that restricts Mass Mutual or the Trustee's right to adjust the value of the Policy because of fraud committed by Mr. Saks, nor could there be. Mass Mutual and the Trustee were not parties to the MSA, they did not consent to any restraint on their ability to determine the value of the policies, and there was no consideration restricting their rights under the Policy. *See* Cal. Civ. Code § 1550 (A valid contract requires: parties capable of contracting, the parties consent to contract; a lawful object, and sufficient cause or consideration). Taking Mrs. Saks argument to its logical conclusion, proscribing Mass Mutual from adjusting the value of the policy in light of Lawrence Saks' fraud would result in the absurd outcome of shifting loss for her husband's fraud to an innocent party.

Next, Mrs. Saks argues that Mass Mutual does not have the right under the terms of the disputed policy to place a lien on the disputed policy or reduce its value based on Lawrence Saks' fraud. An insurance policy, like all contracts, is to be interpreted to effectuate the mutual intent of the parties. *See AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 821 (1990). The Court, where possible, should look solely to the terms of the Policy; the clear and explicit meaning of the Policy terms, understood in their ordinary and popular sense, will govern the Court's interpretation. *Id.* at 822. "If the policy is ambiguous because it is reasonably susceptible to more than one interpretation, the ambiguity is construed in favor of coverage." *Smith Kandal Real Estate v. Cont'l Cas. Co.*, 67

---

[16] The reference in the original contract to Exhibit K was likely done in error. There is no Exhibit K in the MSA. (*See generally* MSA.) The only exhibit that describes the insurance policies is Exhibit J.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | Priority | |
|---|---|---|
| | Send | _____ |
| | Enter | _____ |
| | Closed | _____ |
| | JS-5/JS-6 | _____ |
| | Scan Only | _____ |

**CASE NO.:** <u>CV 13-06411 SJO (PJWx)</u>     **DATE:** <u>June 26, 2015</u>

Cal. App. 4th 406, 415 (1998).

First, Mrs. Saks directs the Court to the following provision contained in the WOP Rider of the Policy: "Waiver of Premiums will not reduce the amount payable in any settlement of this policy." (AR 01-000023.)  This language must be read to apply in the case of a **valid** waiver of premiums. An essential requirement of contract formation is the consent of the parties, Cal. Civ. Code § 1550(2), whereby there is a meeting of the minds.  *Stigall v. City of Taft*, 58 Cal. 2d 565 (1962); *In re First Capital Life Ins. Co.*, 34 Cal. App. 4th 1283 (1995).  It would be ludicrous to conclude that at the time the contract was entered by Mass Mutual, it agreed not to reduce the amount payable if there was actual fraud in the procurement of the waiver.  The Policy's terms, understood in their ordinary and popular sense, compels the conclusion that Lawrence Saks is entitled to the WOP Benefit only if he is legitimately disabled.  It is implausible that the parties intended otherwise.

Second, Mrs. Saks directs the Court to the contestability clauses in the Policy and WOP Rider which read:

> "Representation and Contestability. [Mass Mutual] rel[ies] on all statements made by or for the Insured in the application. Legally, these statements are considered to be representations and not warranties. [Mass Mutual] can bring legal action to contest the validity of this policy for any material misrepresentation of a fact.  To do so, however, the misrepresentation must have been in the application for this policy and a copy of the application must have been attached to this policy when issued.
>
> In the absence of fraud, [Mass Mutual] cannot contest the validity of this policy after it has been in force during the lifetime of the Insured for **two years** from its Issue date, except for failure to pay premiums."

(AR 01-000007-8.)

> "Contestability.  [Mass Mutual] can bring legal action to contest the validity of this rider for any material misrepresentation of a fact made in the application for this rider.  However, [Mass Mutual] cannot contest the validity of this rider after it has been in force during the lifetime of the Insured for two years from its Issue Date."

(AR 01-000025.)

Mrs. Saks argues that the two-year window in which Mass Mutual could have contested the validity of the Policy and rider has closed and thus it is barred from reducing its value or from placing a lien.   Mrs. Saks also attempts to rely on the principle that ambiguous language in an insurance policy should be construed in favor of the insured.  *See e.g. E.M.M.I. Inc.v. Zurich American Ins. Co.*, 32 Cal. 4th 465 (1990) ("Any ambiguous terms are resolved in the insured's favor, consistent with the insured's reasonable expectations.").  Both of her arguments fail for the

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

_____
_____
_____
_____
_____
_____

**CASE NO.:** CV 13-06411 SJO (PJWx)     **DATE:** June 26, 2015

same reason. The clauses plainly state on their face that they limit Mass Mutual's rights in a dispute regarding the validity of the applications for the Policy and WOP Rider, not a dispute over a fraudulent claim. This dispute arises out of Lawrence Saks' fraudulent procurement of the waiver and his failure to pay premiums that should have been paid but for his fraud. In the Policy, Mass Mutual expressly reserved the right to contest the validity of the policy based on fraud or for failure to pay premiums. (AR 01-000008.)

Similar to the reasoning above, prohibiting Mass Mutual and the Trustee from settling the value of the Policy after waiver of premiums accomplished through fraud results in Mrs. Saks receiving the full benefit of the Policy in light of Lawrence Saks' fraud. Mrs. Saks holds an equitable interest in the value of the disputed policy and she remains subject to the agreements entered into by the insurer, the insured, and the trustee. "A third-party beneficiary of a contract can gain no greater rights under that contract than the contracting parties." *Harris v. Super. Ct.*, 188 Cal. App. 3d 475, 479 (1986). Moreover, even if Mr. Saks transferred more than an equitable interest in the Policy to Jeanne Saks, she would still be limited to his rights under the agreement. The California Insurance Code provides:

> "A life or disability policy may pass by transfer, will or succession to any person, whether or not the transferee has an insurable interest. Such transferee may recover upon it whatever the insured might have recovered."

Cal. Ins. Code § 10130. Here, Lawrence Saks' interest in the disputed policy has been transferred to Mrs. Saks. It follows that she can recover only what he is entitled to receive under the Policy.

Finally, Mrs. Saks argues that Mass Mutual's action for declaratory relief is time-barred. She claims that there is no special period of limitations that applies to a cause of action for declaratory relief and that the cause of action that is most analogous sets the statute of limitations. *See Tostevin v. Douglas*, 160 Cal. App. 2d 321, 330 (1958). Here, Mrs. Saks contends that the three year statute of limitations for fraud is the most analogous.

Assuming the three year statute of limitations for fraud applies, Mass Mutual's claims are timely. The unrefuted evidence establishes that Mass Mutual became aware of Mr. Saks' misrepresentations in 2007 and promptly filed a lawsuit against him and the Trustee on June 15, 2007. Mass Mutual agreed to dismiss that lawsuit without prejudice subject to the March 21, 2008 tolling agreement between the Trustee, Mr. Saks, and Mass Mutual. (*See* Mass Mutual's Responding Trial Brief, Decl. of Paul Proko, Ex. 1, 03-000001-000012, ECF No. 111-2.) Later, the parties extended the tolling period through December 16, 2013. (AR 03-000001-000012.) The Trustee filed the instant case on August 30, 2013, prior to the expiration of the tolling agreement. Generally, parties may contract to shorten or lengthen the statue of limitations otherwise applicable. Cal. Civ. Code § 360.5. An agreement extending the statute of limitations must be in writing, signed by the parties, and can be up to four years from the end of the statutory period. *Id.* Successive waivers are allowed. *Id.*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** CV 13-06411 SJO (PJWx)       **DATE:** June 26, 2015

Furthermore, Mrs. Saks contends that she was not a party to the tolling agreement and therefore the statute of limitations were suspended as to the Trustee and Lawrence Saks only. However, as stated above, Mrs. Saks holds a beneficial interest in the Plan assets and the Policy through the assignment of those interests by Lawrence Saks through the MSA. The Trustee is the owner of the Policy and has the power to "enforce any right, obligation or claim in its discretion and in general to protect in any way the interests or the Trust Fund" or to "abstain from the enforcement of any right, obligation or claim." (AR 49-000034.) This language, irrespective of whether or not the Plan is ERISA qualified, gives the Trustee the right to exercise its discretion, including entering into tolling agreements that have an effect on beneficiaries to the Plan. Therefore, the tolling agreement is valid and Mass Mutual's claim for declaratory relief against Mrs. Saks is not time-barred. *See* Cal. Civ. Code § 360.5.

III.    RULING

Accordingly, the Court finds as follows: (1) Plaintiffs and Mass Mutual have not established that the Plan qualifies as an Employee Welfare Benefit Plan as that term is defined under ERISA; (2) the Court retains jurisdiction irrespective of the Plan's disqualification; (3) Lawrence Saks committed fraud and made misrepresentations to Mass Mutual and thus was not entitled to the WOP Benefit; and (4) in light of Mr. Saks' fraud, determination of the value of the Policy is referred to the Parties for resolution and is to be calculated pursuant to the terms of the Policy. The Superior Court retains jurisdiction over any remaining disputes between Mr. and Mrs. Saks pursuant to the MSA (*see* MSA 18: 24-28; *see also* Tr. of Status Conference 40-41). Finally, as to Mass Mutual's counterclaim against Plaintiffs, since there is no remaining dispute as to the rights of the parties under the terms of the Plan or Policy, Plaintiffs, as owners of the Policy are bound by this Order. Each party shall bear its own costs and attorney's fees.

Capital One and Mass Mutual are ordered to meet and confer and to prepare a proposed judgment consistent with these findings and conclusions. The proposed judgment is to be filed and served within fourteen days from this date.

IT IS SO ORDERED.